IN THE CIRCUIT COURT OF SUNFLOWER COUNTY, MISSISSIPPI


IN THE MATTER OF JAMES BOBO

UNNUMBERED


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN THE
PROBABLE CAUSE HEARING OF THE ABOVE STYLE CAUSE, BEFORE
THE HONORABLE ASHLEY HINES, CIRCUIT JUDGE,
ON THE 13TH DAY OF MARCH 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


APPEARANCES:

> **ERICH JERSCHEID, ESQUIRE**
> Attorney at Law
> Post Office Box 55874
> Jackson, Mississippi  39296-5874
> PRESENT AND REPRESENTING JIM BOBO

> **GARY AUSTIN, ESQUIRE**
> Attorney at Law
> 306 Main Street
> Indianola, Mississippi  38751
> PRESENT AND REPRESENTING SUNFLOWER COUNTY

REPORTED BY:

> **TRUDIE QUINN**
> Official Court Reporter
> CCR #1368
> Post Office Box 180506
> Richland, Mississippi  39218
> (601) 932-5354

# <u>I N D E X</u>

**PAGE**

Style, Number and Appearances ....................  1

Index .........................................   2

Index of Exhibits ..............................   3

### <u>WITNESSES: STATE</u>

### EARNEST LEE

Direct Examination by Mr. Austin ................. 8

Cross-Examination by Mr. Jerscheid .............. 11

Redirect Examination by Mr. Austin .............. 25

### WILLIAM CARTER

Direct Examination by Mr. Austin ................. 26

Cross-Examination by Mr. Jerscheid .............. 30

Redirect Examination by Mr. Austin .............. 33

### KELVIN TAYLOR

Direct Examination by Mr. Austin ................. 34

Cross-Examination by Mr. Jerscheid .............. 36

### LARRY CRAIG

Direct Examination by Mr. Austin ................. 37

Cross-Examination by Mr. Jerscheid .............. 39

State Rest ...................................... 40

### <u>WITNESSES: RESPONDENT</u>

### JOHN D. ROGERS

Direct Examination by Mr. Jerscheid .............. 41

Cross-Examination by Mr. Austin ................. 50

**COLE TERRELL**

Direct Examination by Mr. Jerscheid .............. 52

Cross-Examination by Mr. Austin .................. 56

Redirect Examination by Mr. Jerscheid ............ 58

**SEAN SMITH**

Direct Examination by Mr. Jerscheid .............. 60

Cross-Examination by Mr. Austin .................. 62

**JOHN HUNT**

Direct Examination by Mr. Jerscheid .............. 64

Cross-Examination by Mr. Austin .................. 66

Respondent Rest .................................. 67

- o -

Reporter's Page .................................. 69

Certificate of Reporter .......................... 70

**INDEX OF EXHIBITS**

| EXHIBITS | I.D. | EVIDENCE |
|---|---|---|
| 1 - Report, 01-09-17 | | 55 |

- o -

1      **P R O C E E D I N G S**

2              BY THE COURT:  This is a probable cause

3      hearing on Officer James Bobo.  It's an unnumbered

4      case.  You may proceed.

5              BY MR. AUSTIN:  Your Honor, there's a

6      motion before the Court and I don't know if Mr.

7      Jerscheid -- you want to argue that motion?

8              BY MR. JERSCHEID:  May it please the Court,

9      your Honor?

10              BY THE COURT:  You may.

11              BY MR. JERSCHEID:  Your Honor, my name is

12      Erich Jerscheid.  It's spelled J-e-r-s-c-h-e-i-d.

13      And before the Court today is an amended motion

14      regarding my client Jim Bobo's request for the

15      Court to strike the affidavit, stay the proceedings

16      and to stop this even from going forward.

17              Your Honor, there is some statutory,

18      inventory language that's cited in the motion that

19      my client would be entitled to a judgment against

20      Earnest Lee, and the affidavit that's here today,

21      your Honor, as far as this probable cause hearing

22      it sets a dangerous precedent.

23              We've got a police officer who someone has

24      sought a peace bond against him during the course

25      of an investigation.

1   Your Honor, candidly, that stymies law

2   enforcement's ability to be able to go forward in

3   investigations in the event that there is some

4   complaint about how the police officer handles it.

5   And quite frankly, your Honor, to the

6   extent that the statute requires my client to have

7   a probable cause hearing, it removes any

8   prosecutorial discretion, I believe, from the

9   prosecutor being able to make an independent

10   judgment simply by virtue of a couple of attorney

11   general opinions.

12   BY THE COURT:  You do realize that the

13   statutory scheme is for the protection of the

14   officers, don't you?

15   BY MR. JERSCHEID:  Yes, your Honor, I do.

16   BY THE COURT:  All right.

17   BY MR. JERSCHEID:  And just a couple of

18   points that I would ask the Court to take into

19   consideration or hold in abeyance.

20   Your Honor, the affidavit doesn't charge my

21   client with a criminal offense.  It doesn't charge

22   him under any statute, and quite frankly I don't

23   think the law supports Earnest Lee having standing

24   to seek a petition on behalf of the State of

25   Mississippi.

1    Second point, your Honor, he would be

2 filing this certainly as a private citizen and

3 acknowledging Mr. Lee's right to petition the

4 government.

5    A private citizen has no general interest

6 to determine whether any form of prosecution is

7 proper, and on that point, your Honor, it would

8 respectfully be put before the Court that the

9 statute violates my client's rights under the equal

10 protection clause.  And two, that Mr. Lee has no

11 standing to seek relief on behalf of the State of

12 Mississippi.

13    The last point, your Honor, is that this is

14 a matter that has been investigated internally by

15 Central Department of Corrections personnel, and by

16 Central I mean the executive administration.

17    And I believe there will be a report put

18 before the Court today that the allegations that

19 Mr. Lee has made came long after an investigation

20 was completed.

21    Now, as part of that investigation, your

22 Honor, the evidence will speak for itself that a

23 thorough investigation was completed.

24    It was an independent investigation.  It

25 was done by what would otherwise be an internal

1    affairs group through the state level at the state

2    agency through the Department of Corrections.

3          To that end, your Honor, the matter has

4    already been litigated.  I believe that any action

5    that has been taken has been taken by the

6    Department of Corrections administration.

7          And for those reasons, your Honor, and the

8    facts would show -- or that they would not show in

9    the actual report itself that was considered by the

10   state, there are simply no facts showing that my

11   client had any wrongdoing.

12         So for those reasons, your Honor, we would

13   ask that the Court would grant the instant motion

14   the amended -- first amended notice of special

15   appearance, and we're seeking relief under Rule 65

16   as well as extraordinary relief by statute and

17   request that the Court enter a judgment against

18   Earnest Lee according to Section 11-41-1 of the

19   Mississippi Code.  Thank you.

20         BY THE COURT:  Very well.

21         BY MR. AUSTIN:  Your Honor, as you're aware

22   I'm mandated to do these hearings and I do not have

23   any discretion.

24         However, Mr. Lee has filed an affidavit

25   that he was assaulted which constitutes a crime in

1    the state.  No warrant has been issued until this

2    hearing has been held.

3              Rule 65, I believe, of the Rule of Civil

4    Procedure, this is criminal, and regardless of what

5    CID -- and he is aware that was their report but,

6    however, I don't have that discretion.  I have to

7    have this hearing unless the Court rules otherwise.

8              BY THE COURT:  All right.  Well, I'll take

9    that under advisement and we will proceed with the

10   hearing at this time.

11             BY MR. AUSTIN:  All right.  The first

12   witness, your Honor, will be Mr. Eddie Lee.

13                    **EARNEST LEE,**

14   called on behalf of the State, having been duly sworn by

15      the clerk, was examined and testified as follows:

16   **DIRECT EXAMINATION BY MR. AUSTIN:**

17        Q.    Mr. Lee, would you state your name, please.

18        A.    Earnest Lee.

19        Q.    And where are you employed?

20        A.    Mississippi Department of Corrections.

21        Q.    What is your position?

22        A.    Superintendent.

23        Q.    I believe you have filed an affidavit

24   alleging that Mr. Bobo assaulted you, is that correct?

25        A.    Yes, sir.

1      Q.      And what date?

2      A.      November the 21st, 2016.

3      Q.      Did that occur at Parchman which is part of

4  Sunflower County?

5      A.      Yes, sir.

6      Q.      Just tell the Court what happened.

7      A.      It was during the course of an incident that

8  took place and I went over to -- my supervisor instructed

9  me to go over to see what was going on during the

10  incident.

11         And once I arrived over there CID was talking to

12  the suspect and I asked to talk to the individual, and

13  during the course of me being there Mr. Bobo, he came up

14  and placed his hand on me and I told him not to put his

15  hand on me.

16         And his supervisor instructed him as well, Mr.

17  Rogers, John Rogers, and during the course of that

18  incident Mr. Bobo came back up and grabbed me by my wrist

19  for a second time.

20      Q.      You said your supervisor.  You're the

21  superintendent, so you don't have a supervisor.  So who

22  are you talking about?

23      A.      Mr. Jerry Williams, out of central office.

24  He's the deputy commissioner of the institution.

25      Q.      Okay.  So he's your boss?

Earnest Lee - Direct                                                    10

1      A.     Yes, he is.

2      Q.     Okay.  I didn't understand that.  So he

3  touched you at one time and he came back later and

4  grabbed your wrist, is that what you're telling us?

5      A.     Yes, sir.

6      Q.     And what were you doing at the time?

7      A.     Well, during that time when he grabbed my

8  wrist I grabbed his wrist, and then various staff

9  separated the both of us.

10     Q.     I have spoken with Officer Rogers.  He said

11 he was around the corner, so he did not see any of these

12 incidents, would that be correct?  I know he was present

13 but he wasn't actually there with you.

14     A.     No, that's not correct.  That's the first

15 time.  During the course of the incident Mr. Rogers had

16 left out and I had gotten the officer and told the

17 officer we was leaving the conference room, and once I

18 entered the hallway Mr. Bobo was out in the hallway.

19         Once I entered the hallway Mr. Bobo come running

20 toward me and grabbed me at that point.  Now, at that

21 point Mr. Rogers, he wasn't in the vicinity, he was in

22 another office.  When Mr. Bobo grabbed me by my wrist Mr.

23 Rogers was inside the office.

24         BY MR. AUSTIN:  Okay.  That's all I have,

25     your Honor.

1                BY THE COURT:  Any cross-examination of

2    this witness?

3                BY MR. JERSCHEID:  Yes, your Honor.

4                BY THE COURT:  You may proceed.

5    **CROSS-EXAMINATION BY MR. JERSCHEID:**

6         Q.    Mr. Lee, my name is Erich Jerscheid.  I

7    represent Jim Bobo.  Let me ask you some yes or no

8    questions.  For some reason you have any misunderstanding

9    of it, please let me know and I will be glad to rephrase

10   it for you.  Okay?

11        A.    Yes, sir.

12        Q.    All right.  Just a few minutes ago I believe

13   you testified that you submitted this affidavit on

14   November 21st of 2016, is that correct?

15        A.    Correct.

16        Q.    And that would not be an accurate statement,

17   would that be correct?

18        A.    Say that again.

19        Q.    And that would not be an accurate statement,

20   would that be correct?

21        A.    Accurate statement on what?

22        Q.    Is that an inaccurate statement?

23        A.    I submitted it when?

24        Q.    I'm asking you the questions, sir.

25        A.    Right.  What's the question?

1    Q.    What day did you submit?

2    A.    I don't exactly know what day I submitted it.

3          BY MR. AUSTIN:  Your Honor, I would object

4    to that line of testimony.  It's not relevant.  You

5    can make an affidavit and say anything you want.

6    There's no prohibition.

7          BY THE COURT:  I'll sustain the objection.

8          BY THE WITNESS:  I would have to look on my

9    paperwork to see exactly what date.

10   Q.    Superintendent Lee, you also testified

11   earlier that there were two grabs by the wrist.  Do you

12   recall filling out an affidavit in this?

13   A.    Yes, I do.

14   Q.    Has it been a little while since you looked

15   at it?

16   A.    Yes.

17   Q.    Is there anything on this affidavit that

18   might help refresh your recollection?  We're talking

19   about the events that occurred on November 21st, the

20   events that you've alleged in the affidavit.

21   A.    What?

22   Q.    We're talking about the events that you've

23   alleged in this affidavit.

24   A.    Right.

25   Q.    And I'm going back to the events that you've

1    actually alleged in the affidavit versus what your

2    testimony was just a few minutes ago.

3         A.    Right.

4         Q.    So would your affidavit help refresh your

5    recollection?

6         A.    Would it help?  No, it wouldn't.

7         Q.    Okay.  So you're having a tough time

8    remembering what happened that day?

9         A.    No.

10        Q.    Mr. Lee, I believe that you also made a point

11   in this affidavit that you suffered bodily injuries?

12        A.    In that affidavit it's not the complete

13   incident that took place.

14        Q.    So it's only a partial affidavit?

15        A.    It's not the complete incident that took

16   place in the affidavit.  It's just the fact that Mr. Bobo

17   assaulted me.

18        Q.    So what injuries were caused to you, sir?

19        A.    Physical contact.

20        Q.    And bare physical contact is what you

21   consider to be bodily injury?  Yes?

22        A.    Yes, sir.

23        Q.    And you work at the Mississippi State

24   Penitentiary, correct?

25        A.    Correct.

1    Q.    And how many inmates do y'all house out
2  there?
3    A.    We have close to 35 names.
4    Q.    And so it's safe to say you probably get
5  bumped into a fair amount?
6    A.    Not that I know, sir.
7    Q.    I believe also earlier you testified that you
8  were speaking with someone who was being investigated by
9  CID?
10   A.    Yes.
11   Q.    And at that time that you spoke with that
12 individual, you were aware that they were under an
13 investigation, correct?
14   A.    During the time I spoke with the individual,
15 I was aware that he had been assaulted by CID.
16   Q.    But at the time that you went in to speak
17 with this particular officer, you were placed on notice,
18 sir, that CID was performing or was in the middle of a
19 law enforcement investigation, correct?
20   A.    No.  My warden called me and told me that CID
21 had just assaulted an officer, that's why I went over
22 there.
23   Q.    And which warden would that be?
24   A.    Warden Timothy Morris.
25   Q.    And so the claim that this officer had been

1    assaulted by CID officers, correct, your testimony is

2    that that was the basis for your entry into the room?

3         A.    Correct.

4         Q.    And how did Warden Morris call you?

5         A.    By phone.

6         Q.    And how long had this particular officer been

7    in the room at the time that you had gone in there?

8         A.    I don't have any knowledge.  I was not there.

9              BY MR. JERSCHEID:  Court's indulgence.

10             BY THE COURT:  Very well.

11        Q.    Mr. Lee, did you ever go seek any medical

12   evaluation?

13        A.    No, sir.

14        Q.    And why don't you show us exactly how my

15   client put his hands on you.  Let's start with the first

16   one.  How did he do it?

17             BY MR. JERSCHEID:  And Judge, if he can

18        stand and show us, please?

19             BY THE COURT:  Very well.  You may.

20             BY THE WITNESS:  The first time he came he

21        put his hand, he grabbed me by my left wrist and I

22        grabbed him by his left wrist.  The second time he

23        ran into me when I came out in the hallway and

24        grabbed me.

25        Q.    And that first time that you were talking

1    about he grabbed your wrist, you said it was the what,

2    the left wrist?

3         A.    Yes, sir.

4         Q.    So he would have grabbed your left wrist with

5    his right?

6         A.    I don't know.

7         Q.    And what about the second time, Mr. Lee?

8         A.    Second time what?

9         Q.    The second time you testified earlier that he

10   grabbed you.

11        A.    What about it?

12        Q.    I'm asking you to show us a demonstration of

13   that as well?

14        A.    He ran into me like this, like he was coming

15   to subdue me.

16        Q.    Superintendent Lee, at what point did you

17   slap my client in the face?

18        A.    When he ran into me and grabbed me.

19        Q.    Out in the hallway?

20        A.    Right, in the hallway, yes.

21        Q.    And show us again how he approached you?

22        A.    Which one?

23        Q.    The second time.

24        A.    He came at me like that.

25        Q.    Were there any other officers around?

1    A.    Yes, sir.

2    Q.    CID officers?

3    A.    Yes, sir.

4    Q.    And which officers would those be?

5    A.    I know Mr. William Carter for one.  I know

6    because he was in the office with me on the CID side.  I

7    don't know about any of the other CID staff.

8    Q.    And did you put your hands on anybody else

9    that day, Mr. Lee?

10   A.    No, I didn't.

11   Q.    It's your testimony before the Court today

12   that you didn't put your hands on any other CID

13   investigator?

14   A.    That's correct.

15        BY MR. JERSCHEID:  A brief moment, your

16   Honor.

17        BY THE COURT:  Very well.

18   Q.    Mr. Lee, are you aware what these officers

19   were investigating at the time that you went into the

20   room?

21   A.    No, I wasn't.

22   Q.    If they were investigating an inmate assault,

23   would that surprise you?

24   A.    Say that again.

25   Q.    If they were investigating an inmate assault,

1    would that surprise you?

2        A.      Would it surprise me?

3        Q.      Correct.

4        A.      No.  That's part of their job.

5        Q.      But on this particular day you decided that

6    you wanted to stop what they were doing?

7        A.      On that particular day I decided to go over

8    there because my warden called and said that they had the

9    officer on the floor assaulting the officer.

10       Q.      And that officer is not here today, correct?

11       A.      I don't see him.

12       Q.      Now, you would agree with me, Superintendent

13   Lee, that the particular officer who was subdued was

14   rather large, would you agree with that?

15       A.      Yes.

16       Q.      And it sometimes takes a little bit more to

17   get large individuals down than it does short people like

18   me, agree?

19       A.      I don't know.

20               BY MR. AUSTIN:  Your Honor, it's

21        interesting testimony of Mr. Lee, but what Mr. Lee

22        may have perceived about another officer is not

23        relevant.

24               BY THE COURT:  Well, I will sustain that

25        objection.

1    Q.    Mr. Lee, at what point were you blocking the

2    door?

3    A.    At what point I was blocking the door?

4    Q.    Correct.  At what point were you blocking the

5    door?

6    A.    The officer was sitting right next to the

7    door so I was standing right -- as soon as I went in the

8    officer was right next to the door.  So all the time I

9    was in the conference room I was at the door.

10    Q.    And at any time did you refuse to allow a CID

11    officer to leave?

12    A.    No.

13    Q.    You never blocked anybody's access?

14    A.    I was standing at the door.  He could have

15    went around me.

16    Q.    Do you recall saying anything to that

17    officer?

18    A.    Yes, I spoke to the officer.

19    Q.    And do you recall whether he attempted to go

20    around you?

21    A.    What officer?

22    Q.    My client.

23    A.    You're talking about CID.  He's not an

24    officer, he's CID.  So when you said officer I thought

25    you was talking about Officer Tyler, the officer that was

1    being assaulted.

2         Q.    No.  We're here on this one.

3         A.    Well, the only thing I said to Mr. Bobo was

4    told him not to put his hand on me.

5         Q.    Because why?

6         A.    Because why?

7         Q.    Yes, sir.  Why?

8         A.    Because he shouldn't put his hand on me.

9         Q.    You threaten him back?

10        A.    Did I threaten him back?

11        Q.    Correct.

12        A.    He didn't never threaten me.  I didn't never

13   threaten him.  I just told him not to put his hand on me.

14        Q.    And he didn't in fact put his hands on you,

15   did he?

16        A.    I didn't understand what you said.

17        Q.    He did not in fact put his hands on you.

18        A.    Yes, he did.  He put his hands on me.

19        Q.    At the time he was attempting to walk out?

20        A.    At the time he was attempting to walk out, I

21   don't know nothing about the time he was attempting to

22   walk out, because there was so much going on I was

23   talking to about two or three people at the same time

24   during the course of the incident.

25        Q.    There were a lot of distractions, correct?

1      A.     A lot of things going on at the same time.

2      Q.     And there was in fact another officer who was

3  involved after you slapped my client in the face,

4  correct, another CID investigator?

5              BY MR. AUSTIN:  Your Honor, the questions

6         concerning slapping Mr. Bobo tend to be questions

7         that caused Mr. Bobo to charge Mr. Lee and

8         therefore he is not required to testify regarding

9         slapping Mr. Bobo.  He has a good right not to do

10        so.

11             BY MR. JERSCHEID:  I'll withdraw the

12        question, your Honor.

13             BY THE COURT:  Well, that's correct.

14     Q.     Was there another officer involved in

15  necessarily taking you down at one point?

16     A.     Another officer involved in taking me down?

17     Q.     Correct.

18     A.     It was a number of staff involved during that

19  situation with myself and Mr. Bobo.

20     Q.     And if that was the point, Mr. Lee, that your

21  wrist was grabbed, would you really be able to identify

22  whether it was my client who grabbed it?

23     A.     The incident, it's a number of staff involved

24  during that incident.  That was the second incident.  And

25  then on the first incident it was a few staff involved,

1    but I know Mr. Bobo came up and grabbed my wrist because

2    I was looking dead at him.  It wasn't anyone else,

3    because I was talking to him as he was approaching me.

4         Q.    What were y'all talking about?

5         A.    We was talking about the situation that was

6    going on.  He was telling me that I didn't need to know

7    what was going on.  He's telling me it was a criminal

8    matter, and I told him it's about an institutional

9    matter.

10        Q.    And you would agree with me that as the

11   superintendent it is your job to interview staff for

12   administrative and staff related issues, correct?

13        A.    Correct.

14        Q.    But you would also agree with me then that

15   law enforcement has an obligation to conduct criminal

16   investigations, correct?

17        A.    Correct, but they don't have an obligation to

18   assault staff.

19        Q.    So Mr. Lee, if I'm hearing this correctly,

20   this is more about assaulting the staff than it is about

21   CID investigators attempting to perform an investigation

22   or as they're performing an investigation?

23        A.    I went over there because the incident was

24   reported to me.  CID and the officer was having a fight

25   inside the conference room, and that's an institutional

Earnest Lee - Cross

 1    matter.

 2         Q.    But CID doesn't report to you, correct?

 3         A.    Everybody that work at MSP report under the

 4    superintendent indirectly.  A supervisor might be at

 5    central office but the superintendent run the

 6    institution.

 7         Q.    So you're aware of every criminal

 8    investigation that's ongoing at the state penitentiary?

 9              BY MR. AUSTIN:  Your Honor, I think this is

10         going far beyond the question of whether or not he

11         assaulted someone.

12              BY THE COURT:  If that's an objection I'll

13         sustain the objection.

14              BY MR. AUSTIN:  Thank you.

15              BY MR. JERSCHEID:  Court's indulgence.

16              BY THE COURT:  Very well.

17              BY MR. JERSCHEID:  One last question, your

18         Honor.

19              BY THE COURT:  Very well.

20         Q.    Mr. Lee, you're familiar with use of force,

21    correct?

22         A.    Correct.

23         Q.    And the department --

24              BY MR. AUSTIN:  Your Honor, again I object.

25         It goes beyond the scope of this hearing.

1          BY MR. JERSCHEID:  Your Honor, if I may

2     respond briefly?

3          BY THE COURT:  Very well.

4          BY MR. JERSCHEID:  This has everything to

5     do with use of force, and Mr. Lee has alleged that

6     my client grabbed him by the wrist and attempted to

7     subdue him during the course of a criminal

8     investigation.

9          Assuming that those were the facts that are

10     not required to the Court, your Honor, my client

11     would certainly be able to cross-examine Mr. Lee on

12     matters regarding use of force in this particular

13     matter.

14          BY THE COURT:  I will allow it.

15     Q.     Mr. Lee, you're familiar with use of force,

16 correct?

17     A.     Correct.

18     Q.     And as far as any use of force that involved

19 yourself, and by that what you've alleged Investigator

20 Bobo to have committed against you, would you consider

21 that to be excessive force?

22     A.     Everybody rate force differently.

23          BY MR. JERSCHEID:  I have no further

24     questions, your Honor.

25          BY THE COURT:  Any redirect?

1    **REDIRECT EXAMINATION BY MR. AUSTIN:**

2        Q.    Superintendent Lee, is there anything else

3    you wish to add?

4        A.    Yes, sir.  I would just like to add that

5    during the course of that incident, the only reason I was

6    only there like I prior stated, that it was reported that

7    CID was in the conference room over at 29 assaulting an

8    officer.

9            I received a call from my warden, and I was

10   instructed by my supervisor, Mr. John Wheaton, to go over

11   and see what was going on.

12               BY MR. JERSCHEID:  Your Honor, I'm gonna

13       object at this point.  I'll withdraw it.

14               BY THE WITNESS:  And once I arrived over

15       there and wanted to speak to Mr. Rogers, the CID,

16       directly at him and speak to find out what was

17       going on, he told me it wasn't my business, and the

18       officer had stated that he had been assaulted by

19       CID.

20       Q.    Okay.  But back to the point.  Your

21   allegation is that Mr. Bobo assaulted you twice?

22       A.    Yes, sir.

23               BY MR. AUSTIN:  That's all we have of Mr.

24       Lee, your Honor.

25               BY THE COURT:  You may step down.

1          (WITNESS STEPS DOWN.)

2          BY MR. AUSTIN:  We call Officer Carter.

3                    **WILLIAM CARTER,**

4     called on behalf of the State, having been duly sworn by

5        the clerk, was examined and testified as follows:

6          BY MR. AUSTIN:  May I proceed?

7          BY THE COURT:  You may.

8     **DIRECT EXAMINATION BY MR. AUSTIN:**

9          Q.    Officer Carter, would you state your full

10    name, please.

11         A.    William Carter.

12         Q.    And Mr. Carter, you work for Criminal

13    Investigation Division?

14         A.    Yes, sir.

15         Q.    And that is a law enforcement agency?

16         A.    Yes, sir.

17         Q.    You as well as Mr. Bobo are law enforcement

18    officers?

19         A.    Yes, sir.

20         Q.    And were you present during the incident that

21    Superintendent Lee was testifying about?

22         A.    Yes, sir.

23         Q.    Tell us what happened, what you saw?

24         A.    On that day in question we ended up

25    interviewing an officer in reference to a complaint we

William Carter - Direct

1    had come in about an inmate getting assaulted.

2          After questioning the officer he denied

3    assaulting an inmate, we noticed what appeared to be

4    blood on his pants, and so we told him we're gonna have

5    to have your pants for evidence.

6          Chief Rogers told him don't leave the conference

7    room so he can go out and call the director.  So when

8    Chief Rogers was out he got up and went to leave and

9    Investigator Bobo told him he couldn't leave.

10         He said he was leaving.  Investigator Bobo stood

11   in front of the door.  He grabbed Investigator Bobo and

12   threw him out of the way.  I grabbed Officer Tyler around

13   his body and pushed him into the wall trying to stop him

14   from leaving.

15         He pushed me off, and by that time Investigator

16   Bobo had done got back up, and we both was trying to

17   struggle with him telling him he wasn't going nowhere

18   with that evidence on his pants.

19         Well, at that time Chief Rogers and Warden Morris

20   had entered the conference room and assisted on taking

21   him down.  Well, we got him on the ground and he was

22   still resisting, trying to get up, and Officer Tyler is a

23   pretty large fellow.

24         I told him, I said, quit resisting, stop

25   resisting, and then I told Warden Morris that he was

 1    under arrest, he was resisting, he's failing to comply,

 2    disorderly conduct, he's under arrest.

 3         We advised Deputy Warden Cox, I think it was, to

 4    contact K9 because we had another field op agent that was

 5    involved in the same incident to be interviewed in the

 6    conference room -- well, in the admin building of 29.  So

 7    we requested the assistance of K9.

 8         Well, when we finally got Officer Tyler in cuffs

 9    and picked him up and sat him back in the chair,

10    Superintendent Lee entered the conference room with K9.

11         And he was telling the chief he wanted to talk to

12    Officer Tyler, and chief was telling him he was being

13    interviewed, this is an investigation, ongoing

14    investigation, that we got to get through doing what we

15    was doing.

16         And Superintendent Lee kept telling him, no, he's

17    gonna go with me, and Chief Rogers kept saying, no,

18    you're gonna stay here.  Well, it was on and on and on.

19         I did not see, you know, I don't know what

20    happened with Superintendent Lee and Bobo the first

21    incident he was talking about Bobo grabbing his wrist.

22         I do know Superintendent Lee was standing in

23    front of the door and had the door blocked and wouldn't

24    allow nobody to come in or out of the conference room.

25         At one point in time Chief left the conference

1    room to go talk to either the director or somebody, and

2    while they was gone everybody was out.

3           I was standing in the doorway of the conference

4    room and Superintendent Lee was standing on the outside

5    of the conference room and Steven Tyler was still inside

6    the conference room.

7           And he was telling Steven Tyler, come on, let's

8    go, and I blocked the door with my arm over the doorway

9    and said, no, let's just wait, he's staying in here, let

10   everybody get on the same page.

11          Superintendent Lee grabbed my arm and tried to

12   move me out of the doorway and that's when -- Bobo, I did

13   not see him come toward Superintendent Lee.  I did hear

14   Investigator Bobo say, come on, Superintendent, back up.

15          Superintendent then turned around and assaulted

16   Bobo, and when he assaulted Bobo I grabbed him.  When I

17   grabbed Superintendent, unknown K9, I don't know who all

18   it was, jumped on my back and we all hit the couch in the

19   conference room.  At the time some K9 grabbed Bobo and

20   had him pinned on the couch in the conference room.

21   Q.     So you did not see Bobo assault warden?

22   A.     No, sir.

23   Q.     Did you see him grab his hand, anything?

24   A.     I did not see any kind of contact between

25   Superintendent and Bobo.

1      Q.     So y'all were somewhat of a mess, I guess

2  would be the best description?

3      A.     Yes, sir.

4      Q.     And Officer Rogers was not in there when the

5  assault occurred, correct, or allegedly occurred?

6      A.     He's saying two assaults.  That one time when

7  he assaulted Bobo when he's saying Bobo run up to him,

8  Chief was not in the room.

9          I don't know when the other time in the

10 conference room he's replying to that Bobo grabbed him, I

11 don't know, I can't answer that.

12     Q.     You actually saw the assault against Bobo

13 also?

14     A.     Yes, sir.

15            BY MR. AUSTIN:  Tender the witness, your

16     Honor.

17            BY THE COURT:  Any cross of this witness?

18            BY MR. JERSCHEID:  A couple of brief

19     points, your Honor.

20            BY THE COURT:  Very well.

21 **CROSS-EXAMINATION BY MR. JERSCHEID:**

22     Q.     Investigator, my name is Erich Jerscheid.  I

23 represent fellow Investigator Jim Bobo.  Do you recall

24 what you were investigating that day?

25     A.     Yes, sir.  It was an assault on an inmate.

1    Q.    Do you recall the injuries that the inmate
2    sustained?
3    A.    He had some, if I'm not mistaken, some marks
4    on his face and maybe the head was busted and blood
5    coming from the back of his head, top of his head
6    somewhere.
7    Q.    And during the course of your investigation
8    the officer attempted to leave, correct?
9    A.    Yes, sir.
10   Q.    And when Superintendent Lee entered the room,
11   do you recall his attitude, his demeanor when he walked
12   in?
13   A.    My opinion or -- in my opinion he was there
14   to take Steven Tyler out of the conference room.
15   Q.    To your knowledge would Superintendent Lee
16   have been aware of any alleged assault committed upon
17   this particular officer at that time?
18   A.    No, sir, not to my knowledge.  I don't know.
19   Q.    You were in the room when Officer Tyler
20   attempted to walk out, is that correct?
21   A.    Yes, sir.
22   Q.    And he's a large fellow?
23   A.    Yes, sir.
24   Q.    And at the time that Superintendent Lee
25   entered the room, do you recall anything that he might

William Carter - Cross

 1   have been yelling when he walked in?

 2        A.    Something about he didn't -- he was talking

 3   to the officer and telling him something about contraband

 4   or something, that you didn't bring contraband in or why

 5   is he going to Sunflower County and different stuff,

 6   telling him to tell us that he didn't do this and didn't

 7   -- talking about the contraband.

 8        Q.    And you were investigating a completely

 9   different matter at that time?

10        A.    Yes, sir.

11        Q.    Has Superintendent Lee ever served as a staff

12   advocate previously to your knowledge?

13        A.    Repeat the question.

14        Q.    As a staff advocate?

15        A.    Talking about determining --

16        Q.    As someone who would advocate -- for example

17   --

18             BY MR. AUSTIN:  Your Honor, again we're

19        going so far afield.  It's a criminal matter.

20             BY THE COURT:  The objection is sustained.

21        Q.    What was Superintendent Lee doing at the time

22   that he walked in earlier?

23        A.    He just had his hand on Steven Tyler's left

24   shoulder I think it was or maybe his right -- on his

25   shoulder like he was trying to pull his shirt and Chief

1    had him by the other shoulder kind of holding him in the

2    chair.

3        Q.    And Superintendent Lee was attempting to walk

4    out with him?

5        A.    Yes, sir.

6        Q.    What kind of shape was the room in after the

7    tussle?

8        A.    The table was pushed to the side, maybe some

9    chairs turned over.

10       Q.    As an investigator you're familiar with the

11   use of force?

12       A.    Yes, sir.

13       Q.    And based on your observations that day,

14   would you consider Investigator Bobo's actions to have

15   been excessive based on your --

16       A.    No, sir.

17                BY MR. AUSTIN:  Unless he's talking about

18        his actions against Superintendent Lee, it's not

19        relevant to this matter.

20                BY THE COURT:  Objection is sustained.

21                BY MR. JERSCHEID:  No further questions,

22        your Honor.

23                BY THE COURT:  Any redirect?

24   **REDIRECT EXAMINATION BY MR. AUSTIN:**

25       Q.    Officer Carter, was Tyler charged?

1    A.    Not to my knowledge.

2         BY MR. AUSTIN:  That's all I have of this

3    witness, your Honor.

4         BY THE COURT:  May the witness be excused?

5         BY MR. AUSTIN:  We call Kelvin Taylor.

6         BY THE COURT:  You're free to go about your

7    business.

8              (WITNESS STEPS DOWN.)

9                   **KELVIN TAYLOR**,

10   called on behalf of the State, having been duly sworn by

11   the clerk, was examined and testified as follows:

12        BY MR. AUSTIN:  May I proceed, your Honor?

13        BY THE COURT:  You may proceed.

14   **DIRECT EXAMINATION BY MR. AUSTIN**:

15   Q.    Would you state your name, please.

16   A.    Kelvin Taylor.

17   Q.    Mr. Taylor, I believe you are a K9 officer at

18   Mississippi Department of Corrections?

19   A.    Yes, sir.

20   Q.    You've been in court during this testimony.

21   So on the day that we were talking about the testimony

22   you have heard, is there anything that you can add or

23   tell us any differently than what has been testified to?

24   A.    Only that when we arrived in the conference

25   room Superintendent Lee, he was trying to find out what

1    was going on with the officer and why he was handcuffed

2    to the chair.

3            During that time CID didn't want to tell Mr. Lee

4    what was going on or also tell him that he could leave,

5    so Mr. Lee was trying to get Officer Tyler and take him

6    out of the room so he can get him some medical attention,

7    and CID Bobo grabbed him and they ended up locking up

8    together and we ended up having to pull them apart.

9        Q.      Bobo and who were locked up together?

10       A.      Bobo and Superintendent Lee.

11       Q.      Were they holding each other, pushing, what

12   were they doing?

13       A.      They was just holding each other.

14       Q.      And you helped separate them?

15       A.      Yes, sir.

16       Q.      And you know who grabbed who first?

17       A.      CID Bobo, he grabbed Superintendent first.

18       Q.      And you were not initially there, were you?

19       A.      No, sir.

20       Q.      You were called by CID?

21       A.      No, sir.  Me along with the rest of the K9,

22   we were on a previous detail, and our supervisor informed

23   us that we had to go to 29 and meet Superintendent Lee

24   over there.  We had no idea what was going on at the

25   time.

Kelvin Taylor - Cross

```
 1          All we knew was that we had to meet the
 2   superintendent, and from there outside the gate we walked
 3   over to the conference room, and that's when we saw
 4   Officer Tyler in the chair handcuffed along with CID all
 5   in the conference room.
 6        Q.    Was Tyler handcuffed?
 7        A.    Yes, sir.
 8        Q.    So CID had him sitting in a chair?
 9        A.    Yes, sir.
10              BY MR. AUSTIN:  Tender the witness, your
11         Honor.
12              BY THE COURT:  Any cross-examination of
13         this witness?
14              BY MR. JERSCHEID:  Two questions, your
15         Honor.
16   CROSS-EXAMINATION BY MR. JERSCHEID:
17        Q.    Mr. Jackson?  It's Kelvin, right?
18        A.    Yes, sir.
19        Q.    Okay.  When you first started testifying, I
20   believe you made a statement that CID did not want to
21   tell you what was going on, is that correct?
22        A.    They didn't want to tell Superintendent Lee
23   what was going on.
24        Q.    And to your knowledge, does anybody from CID
25   report directly to the superintendent?
```

1      A.    I wouldn't have any knowledge of that.

2              BY MR. JERSCHEID:  No other questions, your

3      Honor.

4              BY THE COURT:  Any redirect?

5              BY MR. AUSTIN:  No, sir.

6              BY THE COURT:  May the witness be excused?

7              BY MR. AUSTIN:  Yes, sir.

8              BY MR. JERSCHEID:  Yes, sir.

9              BY THE COURT:  You're free to go about your

10     business.

11                  (WITNESS STEPS DOWN.)

12             BY MR. AUSTIN:  We call Officer Larry

13     Craig.

14                      **LARRY CRAIG**,

15  called on behalf of the State, having been duly sworn by

16    the clerk, was examined and testified as follows:

17             BY MR. AUSTIN:  May I proceed, your Honor?

18             BY THE COURT:  You may.

19  **DIRECT EXAMINATION BY MR. AUSTIN**:

20     Q.    State your name, please.

21     A.    Larry Craig.

22     Q.    And Officer Craig, you're part of the K9 unit

23  at Parchman?

24     A.    Yes, sir.

25     Q.    And you were present for this incident we

Larry Craig - Direct

1      have been here today talking about, is that correct?

2          A.     That's correct.

3          Q.     Did you see anything different than what's

4      been testified to earlier?

5          A.     No, sir.

6          Q.     Okay.  So you saw Bobo and Lee grab each

7      other?

8          A.     Yes, sir.

9          Q.     You see any other touching by either one of

10     them?

11         A.     On the first incident Superintendent Lee said

12     we need to get this officer some attention, medical

13     attention.  So when we got ready to get him up CID Bobo

14     ran over and grabbed Mr. Lee's wrist.

15         Q.     And what did Superintendent Lee do?

16         A.     He told CID Bobo to keep his hands off of

17     him.

18         Q.     Did you see Officer Bobo or Superintendent

19     Lee touching each other at any other time?

20         A.     I only heard on that second incident what

21     happened out there in the lobby.

22         Q.     Were they outside your presence?

23         A.     I was in the front.

24         Q.     Anything else you want to add?

25         A.     No, sir.

```
 1              BY MR. AUSTIN:  Tender the witness, your
 2         Honor.
 3              BY THE COURT:  Any cross of this witness?
 4              BY MR. JERSCHEID:  Two questions, your
 5         Honor.
 6    CROSS-EXAMINATION BY MR. JERSCHEID:
 7         Q.    Officer, I believe earlier you testified that
 8    Mr. Bobo grabbed the superintendent, is that correct?
 9         A.    Yes, sir.
10         Q.    And did you also grab my client as well
11    during that time?
12         A.    Pushed him back, separated both of them,
13    pushed both of them back, Superintendent Lee and CID
14    Bobo.
15         Q.    And so at no time did you grab my client?
16         A.    No, sir.
17         Q.    And did you see who grabbed first?
18         A.    CID Bobo.
19         Q.    I believe you've testified that
20    Superintendent was standing at the door?
21         A.    Standing right there on the side, not in
22    front of the door, right there where Officer Tyler was
23    at.
24         Q.    And that was at the time Superintendent Lee
25    attempted to exit the room with Officer Tyler?
```

Larry Craig - Cross

1    A.    Yes, sir.

2              BY MR. JERSCHEID:  No further questions,

3    your Honor.

4              BY THE COURT:  Any redirect?

5              BY MR. AUSTIN:  No, sir.

6              BY THE COURT:  May the witness be excused?

7              BY MR. AUSTIN:  Yes, sir.

8              BY MR. JERSCHEID:  Yes, sir.

9              BY THE COURT:  You're free to go about your

10   business.

11              (WITNESS STEPS DOWN.)

12              BY MR. AUSTIN:  We rest, your Honor.

13              BY THE COURT:  You rest?

14              BY MR. AUSTIN:  Yes.

15              BY THE COURT:  Any testimony by the

16   defendant?

17              BY MR. JERSCHEID:  Well, your Honor, at the

18   time we move ore tenus to dismiss the charges, and

19   pending that motion, of course, we would reserve

20   our right to call rebuttal witnesses that have been

21   here in the courtroom.

22              BY THE COURT:  I'm going to overrule the

23   motion at this time.  I have your earlier motion to

24   dismiss under advisement.  You may proceed.

25              BY MR. JERSCHEID:  Your Honor, at this time

1          we would call Chief Investigator Rogers.

2                        **JOHN D. ROGERS**,

3     called on behalf of the respondent, having been duly

4     sworn by the clerk, was examined and testified as

5     follows:

6     **DIRECT EXAMINATION BY MR. JERSCHEID:**

7          Q.     You mind if I call you Chief Rogers?

8          A.     That's fine.

9          Q.     Chief, my name is Erich Jerscheid.  I

10    represent Investigator Bobo.  Now, why don't you start by

11    telling the Court a little bit about yourself, start with

12    your name and what kind of background you have.

13         A.     John D. Rogers.  I've been working at

14    Parchman since 1989.  Prior to that I was a police

15    officer for the city of Drew.

16             When I went to work at MSP Parchman I went in the

17    K9 unit.  I was there for almost 16 years, left there and

18    went as a deputy warden to the max unit, and then I

19    believe it was May 2009 I went to CID as the

20    investigative chief.

21         Q.     So you've been in charge of investigations at

22    Mississippi State Penitentiary for seven or eight years

23    now?

24         A.     Yes, sir, that would be about right.

25         Q.     And we're here regarding events that occurred

John D. Rogers - Direct

1    on November 21st of 2016.  Do you recall those events?

2         A.    Yes, sir, I do.

3         Q.    Why don't you tell the Court what you

4    observed that day?

5         A.    All right.  Prior to my arrival to Unit 29 we

6    received a complaint from a defendant's mother.  She made

7    the allegation that her son allegedly had been assaulted

8    by two staff members.

9         So I dispatched CID James Bobo and William

10   Carter, both investigators, to the scene to find out if

11   it was true, any merit to the allegation.

12        I guess they had been out there for about 20

13   minutes or so maybe, and I decided to give them a call,

14   and I called, and I forgot which one I talked to, and I

15   asked him was it any merit to it.  They said, yes, he's

16   got blood on his clothing, so I decided to go on out.

17        When I got there we conducted a couple of

18   interviews.  We wound up getting one of the two suspects

19   and interviewed him.  He denied the allegations.  He was

20   questioned under Miranda.

21        We asked him to let us look at his clothing.

22   During that time frame Mr. Bobo spotted what he thought

23   and when I looked at it what appeared to be physical

24   evidence to go along with this alleged assault.

25        So when I saw that I told the suspect officer, I

1    said, sit in this chair, do not go anywhere, and I

2    stepped out of the conference room and I went to Deputy

3    Warden Andy Mills' room to call Director Smith, and I

4    told him what we had.

5         And while I just got off the phone with him I

6    heard the commotion start off in the conference room.  It

7    was a lot of racket and I could tell things was getting

8    tossed around, and I took my glasses off and my hat, I

9    didn't want my glasses broken.

10        When I entered the room I saw them struggling

11   with the suspect staff member, and Mr. Bobo advised me

12   that he had been assaulted and he had placed him under

13   arrest, told him he's under arrest, so I helped.  We

14   subdued the officer.  It took a little bit.  He's pretty

15   strong.

16        We got cuffs on him and I sat him in the chair.

17   Warden Morris was in there.  I don't know if he was in

18   there prior to my entry, I just can't remember, but I

19   know he was there to witness a lot of it.

20        And at that point we had another staff suspect

21   that was being held up in Warden Morris' office, and

22   we're talking about two doors down from the conference

23   room, and I got concerned then.

24        Well, we had to grapple with this one and maybe

25   the other one would have to be grappled with so I told

1    Warden Morris -- well, I asked him, I said, can you get

2    K9 out here to sit with this suspect because we got the

3    other one.

4         Q.    Let me just ask you a brief question on that,

5    Chief Rogers.  As CID y'all are considered law

6    enforcement?

7         A.    That's correct.

8         Q.    And by statute you are authorized to request

9    K9 to facilitate any narcotics detections or any other

10   matters related to tracking down inmates who run off?

11        A.    Right.  Well, actually if we have a matter

12   that pertains to a CID function we can request K9.

13        Q.    And at that time you needed K9?

14        A.    Right.  I just wanted them to pull security

15   on the suspect officer because he had became combative.

16   And anyway, he was sitting in the chair and I looked at

17   him and I told him I said -- I called him by his name and

18   I said, listen, do not go down this road.  I said, do not

19   go down this road.

20            I said, we just had another officer in a similar

21   case at that same unit, 29, the Friday before the 21st I

22   believe it was, pled guilty in the Northern District for

23   -- I think his charge was conspiracy to cover up an

24   investigation, hinder an investigation, and he's supposed

25   to be sentenced, I think, this Thursday in the Northern

1    District.  There was three other suspects in that.

2           So I said, do not go down this road.  I said,

3    this particular officer had the opportunity in my office

4    to tell the truth about that incident.  I said, he did

5    not, and I was telling this to our suspect.

6           I said, do not go down that road.  I said, tell

7    the truth.  And I asked him was he willing to recant his

8    statement and asked him at that time was he willing to

9    relinquish his clothing and his boots; he agreed to it.

10          And about that time that's when Superintendent

11   Lee come up in there with his K9.  He came in the door,

12   grabbed the suspect by the sleeve, his K9 encircled us

13   and told him to come on.  I said, Mr. Lee, he's a suspect

14   in a criminal investigation.

15          And he said, I don't care what's going on, I'm

16   gonna talk to this officer or something along those

17   lines, and he kept trying to pull him up out of the

18   chair.

19          Well, his legs were separating the suspect, so I

20   just kind of stood up.  I encroached his position, and a

21   bunch of grappling happened behind me, K9 and my staff

22   members.  I couldn't see.

23          I had ahold of the suspect and I heard somebody

24   back there snapping pictures with a phone, and I looked

25   back, and I'm pretty sure I remembered it being Sergeant

1    Leather Williams snapping all kind of pictures.

2         Well, anyway, it became a stalemate.  The

3    superintendent grabbed the doorknob.  Mr. Bobo, I told

4    him, I said, go call Director and tell him what's

5    happening.  Mr. Lee wouldn't let him out.

6         Mr. Bobo said, Mr. Lee, can I please leave out or

7    something of that nature, and he asked him again, can you

8    let me out.  Anyway, there's an audiotape that Mr. Bobo

9    started recording during the middle of this process, and

10   you will clearly hear me tell Mr. Lee, I asked him why

11   was he interfering with our investigation.

12        He was informed immediately when he walked in the

13   room to grab our suspect and take him out because he's a

14   suspect in an alleged assault of an inmate and he had

15   what appeared to be physical evidence on his clothing.

16        But he came in and bogarted the situation and

17   tried to remove the suspect.  During that time -- and

18   this is gonna be on the audiotape as well, you'll hear me

19   saying, tell him, Officer Tyler, tell him, Officer Tyler,

20   this is about you, not him, and that's where the

21   recording started.

22        What I was referring to at that moment, I was

23   trying to get him to tell the superintendent that he

24   agreed to recant his testimony and tell the truth and go

25   down the correct road on that investigation.

1        Superintendent Lee began leading him and asking

2    him questions about, you assault anybody, you bring any

3    contraband and all these kind of things, you know,

4    coaching him on his responses against us.

5        Q.    And Chief Rogers, let me ask you one brief

6    question.  Officer Tyler had already waived his Miranda?

7        A.    He signed a Miranda sheet, and when I asked

8    him would he be willing to recant his statement when I

9    told him the part about the other officer, he agreed, and

10   if I'm not mistaken Warden Morris should have been a

11   witness to that and Mr. Carter and Mr. Bobo.

12       But he was ready to recant to some degree if not

13   a full degree.  Mr. Lee started questioning him and

14   asking him.  He realized, it was obvious, and you can

15   tell it when you listen to the audiotape that he knew the

16   superintendent was there for him, and he did a complete

17   180 and started accusing us of all this and all that.

18       So to a degree the Superintendent's actions

19   compromised our investigation at that point, because I

20   believe in my heart I would have already had a recanted

21   testimony from that suspect.

22       Q.    Based on your experience as well and the 27

23   years experience that you had being at the state

24   penitentiary and from your time being on the road, did

25   you observe Officer Tyler demonstrate body language that

1    he was prepared to come forward with was --

2        A.    He sat there nodding his head.  He was

3    sitting in the chair.  Everything was under control, but

4    the superintendent came in there with an agenda to remove

5    our suspect to take him elsewhere.

6        My main concern at that point, I knew if I let

7    him take him out that the chances of maintaining control

8    of the clothing that we wanted to have processed for

9    physical evidence was not gonna happen.

10       So at that point, some point in there

11   Superintendent Lee did step out and leave.  Mr. Bobo went

12   and called, the phone got transferred back to the

13   conference room and I was talking to my director.

14       Q.    At any time did you observe Investigator Bobo

15   put his hands on Superintendent Lee?

16       A.    I don't recall him actually touching him.

17   You'll hear this in the recording, something to the

18   effect Mr. Lee was saying don't put your hands on me.

19   Mr. Bobo said, I don't have him, he's got me.

20       And I may or may not have said don't touch him.

21   I didn't want Mr. Bobo touching Superintendent.  I don't

22   know.  All I know is when that part of this situation

23   broke up, Mr. Bobo did show me his wrist and I saw

24   fingernail marks in his skin and we have pictures of

25   those.

1      Q.     Some of the points that the superintendent

2  was making when he first entered the room, I believe

3  earlier you made a statement along the lines regarding

4  contraband?

5      A.     He was asking the suspect officer did you

6  bring any contraband or something along those lines.  It

7  didn't have anything to do with what we were doing.  I

8  clearly advised him that we were investigating that

9  suspect officer for the alleged assault of an inmate.

10     Q.     Do you recall if Superintendent Lee during

11 that time period suggested to Officer Tyler that it was

12 good that y'all were only there for an inmate assault?

13     A.     He made some kind of comment like that.

14 During the time when Mr. Bobo was asking to leave out,

15 Tyler made a remark, y'all didn't let me leave, and the

16 superintendent remarked, thank you, in a real arrogant

17 tone, and it was obvious to me that he was there to

18 rescue that staff member at all costs.

19     Q.     Do you recall, Chief, how long y'all had been

20 involved in the investigation?

21     A.     The investigation probably prior to the

22 superintendent and the K9 unit's arrival, he was our

23 third witness to interview, probably maybe an hour.  I'm

24 not 100 percent sure.

25     Q.     And it's your obligation as the chief to

John D. Rogers - Cross

1   ensure that your investigators preserve the integrity of

2   the investigation?

3        A.      That's absolutely correct.

4        Q.      And who do you report to, Chief?

5        A.      My supervisor is Director Sean Cason Smith

6   out of central office, director of corrections

7   investigations.

8        Q.      From your experience in the event that there

9   is any internal investigation that's conducted on any

10  particular CID officer at the unit level, are these

11  generally handled at the state level?

12       A.      That would be by our integrity investigators

13  assigned to central office per the direction of Director

14  Smith or the commissioner.

15       Q.      And to your knowledge was an investigation

16  conducted in this case?

17       A.      It was conducted.

18               BY MR. JERSCHEID:  I have no other

19       questions, your Honor.

20               BY THE COURT:  Any cross of this witness?

21               BY MR. AUSTIN:  Yes, sir.

22  **CROSS-EXAMINATION BY MR. AUSTIN**:

23       Q.      Officer Rogers, you've been there 30 years

24  almost.  You ever had superintendents come?

25       A.      Sir, I can barely hear you.

John D. Rogers - Cross

```
 1       Q.      You ever had superintendents come during the
 2    middle of your investigation?
 3       A.      That's the first time that I can recall a
 4    superintendent interfering with an investigation.
 5       Q.      Was Tyler charged?
 6       A.      That investigation was picked up by our
 7    integrity division, and from what I understand the
 8    Federal Bureau of Investigation Department of Justice
 9    should pick it up in the Northern District.
10       Q.      And also you were asked if CID or Central CID
11    Integrity conducted an investigation, and I believe your
12    answer was yes?
13       A.      That's correct.
14       Q.      And I believe the report states that they
15    found no wrongdoing?
16       A.      That's what I was told, yes, sir.
17             BY MR. AUSTIN:  Okay.  That's all I have,
18       your Honor.
19             BY THE COURT:  Any redirect?
20             BY MR. JERSCHEID:  No, your Honor.
21             BY THE COURT:  May this witness be excused?
22             BY MR. JERSCHEID:  Yes, sir.
23             BY THE COURT:  You're free to go about your
24       business.
25                    (WITNESS STEPS DOWN.)
```

1          BY THE COURT:  You may call your next

2     witness.

3          BY MR. JERSCHEID:  Your Honor, we would

4     call Cole Terrell to the stand.

5                    **COLE TERRELL**,

6  called on behalf of the respondent, having been duly

7  sworn by the clerk, was examined and testified as

8  follows:

9  **DIRECT EXAMINATION BY MR. JERSCHEID**:

10     Q.    Investigator Terrell?

11     A.    Yes, sir.

12     Q.    If you don't mind, I'll just call you

13 Investigator Terrell.

14     A.    That's fine.

15     Q.    My name is Erich Jerscheid and I represent

16 Mr. Bobo here, and we're here before the Court regarding

17 events that occurred on or about November 21st, 2016.

18 Now, tell the Court about yourself, who do you work for

19 and what do you do?

20     A.    I work for Mississippi Department of

21 Corrections.  I'm part of the CID division out of Central

22 Office Integrity Division.

23     Q.    And y'all operate it like internal affairs

24 investigators?

25     A.    Yes, sir.

Cole Terrell - Direct

1       Q.      Is that for the entire department or just for

2   CID?

3       A.      No, it's for the entire department.

4       Q.      And in the event that there's a complaint

5   made or an investigation into a CID officer at any

6   facility level, y'all are the ones who handle it?

7       A.      At the direction of the director, yes.

8       Q.      And who's the director?

9       A.      Sean Smith.

10      Q.      And regarding the events of November 21st,

11  2016, do you recall conducting an investigation?

12      A.      Yes, sir.

13      Q.      And based on your investigation, can you tell

14  the Court your findings?

15      A.      I would have to refer to my report for the

16  complete and by the letter of my report findings, but

17  basically through the course of interviewing numerous

18  people, numerous officers, staff investigators, it was

19  determined that -- well, it couldn't be determined that

20  Investigator Bobo ever touched Superintendent Lee.

21      Q.      And based on this investigation, do you

22  recall how many individuals you interviewed?

23      A.      It was a number of them.  No, sir.

24      Q.      Is there anything that might help refresh

25  your memory?

Cole Terrell - Direct

1    A.    My report would be great.

2           BY MR. JERSCHEID:  Your Honor, may I

3    approach the witness?

4           BY THE COURT:  You may.  What's your name?

5           BY THE WITNESS:  Cole Terrell.

6    Q.    Investigator Terrell, I just handed you a

7    document, do you recognize that?

8    A.    Yes, sir.

9    Q.    And what do you recognize that document to

10   be?

11   A.    That is gonna be the memo that I completed

12   after the investigation.

13   Q.    And that memo was authored by you?

14   A.    Yes, sir.

15   Q.    And is it a fair and accurate depiction of

16   the investigation?

17   A.    From everything I can gather, yes, sir.

18           BY MR. JERSCHEID:  And your Honor, at this

19      time I would move to have that memo placed into

20      evidence?

21           BY THE WITNESS:  Can I say one thing.

22      There's four pages of this.  The fourth page is

23      missing.

24           BY MR. AUSTIN:  I have no objection, your

25      Honor.

1              BY THE COURT:  Let it be marked and

2         received into evidence, assuming they can find the

3         fourth page.

4              BY MR. JERSCHEID:  Do you recall what was

5         on that fourth page?

6              BY THE WITNESS:  It's just one line on the

7         fourth page.

8              BY THE COURT:  We'll allow it with the

9         three pages if he recite what the line was.  We'll

10        see what we can do with that.

11             BY THE WITNESS:  You want me to tell you

12        basically what the last line was?

13   Q.    Please.

14   A.    In short it was basically saying that any

15   evidence as far as photos of the injuries sustained to

16   the inmate as well as the officers were available upon

17   request.

18             **(EXHIBIT 1, REPORT, WAS MARKED AND RECEIVED**

19        **INTO EVIDENCE.)**

20   Q.    And to your knowledge did Superintendent Lee

21   have an evaluation of his injuries?

22   A.    To my knowledge, no, sir.

23   Q.    And I direct your attention to the bottom of

24   page 3.  I believe you discussed some key factors?

25   A.    Yes, sir.

1    Q.    Why don't you tell the Court about those.

2    You can just summarize it because it's been entered into

3    evidence.

4    A.    In summary, CID was conducting a lawful

5    investigation.  At the point that evidence was

6    discovered, potential evidence was discovered on the

7    officer's clothing, the CID investigators were then

8    detaining the officer pending the retrieval of that

9    evidence.

10    Q.    And CID officers would have had an obligation

11    to preserve that evidence?

12    A.    Yes, sir.

13    Q.    And the integrity of any investigation is

14    key?

15    A.    Absolutely.

16         BY MR. JERSCHEID:  I have no other

17    questions, your Honor.

18         BY THE COURT:  Any cross of this witness?

19         BY MR. AUSTIN:  Yes, sir.

20    CROSS-EXAMINATION BY MR. AUSTIN:

21    Q.    Officer, did you interview Superintendent

22    Lee?

23    A.    No, sir, I did not.

24    Q.    Did you interview all the witnesses that come

25    here this morning?  Did you interview those two K9

Cole Terrell - Cross

1    officers?

2        A.    I don't recall interviewing them, no, sir.  I

3    had assistance investigating.

4        Q.    Were there conflicting statements between the

5    witnesses that were interviewed?

6        A.    Absolutely.

7        Q.    So the conclusions in that report is you

8    making a decision as to what you thought was credible and

9    believable and who was telling the truth?

10       A.    No, sir.  That would have been just my

11   opinion.  Basically this was an investigation that

12   started, and through the course of the initial part it

13   was determined that everybody needed to be reinterviewed

14   again because there were so many conflicting statements.

15           And at that point we were asked not to interview

16   Superintendent Lee or Chief Rogers.  So we took what we

17   had from recorded interviews from Chief Rogers as well as

18   Superintendent Lee, both over an hour long with other

19   investigators and then put that with the other interviews

20   with Warden Morris and other key people in the

21   investigation, and through the entire investigation

22   nobody could say for sure that they even saw Investigator

23   Bobo touch Superintendent Lee.

24       Q.    So you authored the report, is that correct?

25       A.    Yes, sir.

1      Q.      So you made the decisions?

2      A.      I wrote the report down.

3             BY MR. AUSTIN:  That's all.  Thank you.

4             BY THE COURT:  Any redirect?

5             BY MR. JERSCHEID:  One question, your

6      Honor.

7  **REDIRECT EXAMINATION BY MR. JERSCHEID:**

8      Q.      Officer Cole, just a minute ago you testified

9  that you did not interview Chief Rogers nor

10 Superintendent Lee?

11     A.      Correct.

12     Q.      And that was a directive?

13     A.      Yes.

14     Q.      And who gave that directive?

15     A.      The executive staff.

16     Q.      And that video, was that done before, after,

17 that you had an opportunity to interview the individuals

18 that were here?

19     A.      Excuse me?

20     Q.      When you conducted that video interview, was

21 that after you had interviewed the individuals here or

22 was it prior?

23     A.      The video interview of Superintendent Lee and

24 Chief Rogers, those were conducted by other investigators

25 at our central office on I guess the 22nd and -- yeah.

1      Q.     And you reviewed both of those videos?

2      A.     I didn't watch the video.  I listened to the

3   audio.

4      Q.     Of both Chief Rogers and Superintendent Lee?

5      A.     Yes.

6      Q.     And you stand by your conclusions in this

7   report?

8      A.     Yes, sir.

9             BY MR. JERSCHEID:  No other questions, your

10       Honor.

11            BY THE COURT:  May the witness be excused?

12            BY MR. JERSCHEID:  Yes, please.

13            BY THE COURT:  You're free to go about your

14       business.

15                 (WITNESS STEPS DOWN.)

16            BY THE COURT:  You may call your next

17       witness.

18            BY MR. JERSCHEID:  Your Honor, we would

19       last call Sean Smith.

20                      **SEAN SMITH**,

21   called on behalf of the respondent, having been duly

22   sworn by the clerk, was examined and testified as

23   follows:

24            BY MR. JERSCHEID:  May I proceed, your

25       Honor?

1      BY THE COURT:  You may.

2  **DIRECT EXAMINATION BY MR. JERSCHEID**:

3      Q.    Director Smith, good morning.

4      A.    Good morning.

5      Q.    My name is Erich Jerscheid and I represent

6  Jim Bobo, and we're here before the Court today on the

7  affidavit that was filed by the superintendent, and it's

8  getting to be about lunchtime, so I'll keep it pretty

9  short.

10     A.    Appreciate it.

11     Q.    Director Smith, as the director for CID your

12 job is -- tell us a little bit about your job.

13     A.    Being the director of CID I oversee and

14 supervise and review investigations that happen

15 throughout the state whether they're at the three

16 institutions or they're at the integrity level which is

17 at central office.  I direct, assign, review and approve

18 cases.

19     Q.    And your decision on those cases is based on

20 the investigations conducted by your integrity

21 investigators?

22     A.    Yes, and also the internal affairs

23 coordinators, yes.

24     Q.    And do you recall a memorandum regarding Jim

25 Bobo that was authored by Cole Terrell?

1    A.    Yes.

2    Q.    And have you recently reviewed that memo?

3    A.    I have not recently reviewed it, no, sir.

4    Q.    Do you recall some of the details off of it

5    that jumped out to you?

6    A.    Not that I can testify without looking back

7    at it, no, sir.

8    Q.    Would that help refresh your recollection?

9    A.    Yes.

10         BY MR. JERSCHEID:  May I approach, your

11    Honor?

12         BY THE COURT:  You may.

13         BY MR. JERSCHEID:  Your Honor, I would ask

14    that the director reflect on -- I believe it's

15    Plaintiff's 1.

16    Q.    Director Smith, I just handed you a document

17    -- well, it's already been admitted into evidence, so we

18    will strike that, please.

19        Director Smith, I would like to draw your

20    attention to the top left-hand corner of that first page.

21    Can you tell us what that says?

22    A.    At the top left-hand corner it says closed

23    and it has my signature and the date that it was closed.

24    Q.    So this matter was investigated, considered

25    -- or it was investigated for facts, correct?

Sean Smith - Cross

1      A.      Correct.

2      Q.      And it was closed January 9th?

3      A.      Correct.

4      Q.      And without going too far into detail, your

5  job as the director is to make administrative decisions

6  regarding your CID investigators?

7      A.      Yes.

8      Q.      And by administrative decisions that also

9  includes employment decisions, correct?

10     A.      Yes.

11     Q.      And Investigator Bobo is still with CID?

12     A.      Yes.

13     Q.      And so you've already made a decision on this

14  case, correct?

15     A.      Yes.

16             BY MR. JERSCHEID:  I have no other

17      questions, your Honor.

18             BY THE COURT:  Any cross-examination of

19      this witness?

20             BY MR. AUSTIN:  Yes, sir.

21  **CROSS-EXAMINATION BY MR. AUSTIN**:

22     Q.      Director Smith, you realize your decisions

23  are not binding on this Court?

24     A.      Yes.

25     Q.      And your decisions were made on reports

1    gathered by some of your officers?

2         A.    That's correct.

3         Q.    And are you aware that we're here not for a

4    trial on Mr. Bobo but to determine probable cause, that

5    is, that Superintendent Lee was probably assaulted and if

6    he in fact were then it was Mr. Bobo who probably did it?

7         A.    I understand that's the reason we're here,

8    yes, sir.

9         Q.    So based upon what you were told, you don't

10   believe there's probable cause, but you were not one of

11   the persons who actually interviewed any of those

12   witnesses?

13        A.    That is correct.

14        Q.    And you heard the officer just prior to you

15   state there were conflicting statements?

16        A.    Yes, sir.  When Mr. Cole was sent out this

17   determined to be a preliminary inquiry as to finding out

18   the exact facts of what transpired and so forth, and when

19   he came back he was able to provide the preliminary

20   issues of everybody that he had interviewed.  And yes, it

21   did show that there were some conflict, yes, sir.

22                  BY MR. AUSTIN:  That's all I have, your

23           Honor.

24                  BY THE COURT:  Any redirect?

25                  BY MR. JERSCHEID:  No, your Honor.

John Hunt - Direct

1        BY THE COURT:  May the witness be excused?

2        BY MR. JERSCHEID:  Yes, your Honor.

3        BY THE COURT:  You're free to go about your

4     business.

5              (WITNESS STEPS DOWN.)

6        BY THE COURT:  Anything further?

7        BY MR. JERSCHEID:  Your Honor, at this time

8     we would call Investigator John Hunt.

9                    **JOHN HUNT**,

10    called on behalf of the respondent, having been duly

11    sworn by the clerk, was examined and testified as

12    follows:

13    **DIRECT EXAMINATION BY MR. JERSCHEID**:

14        Q.     Investigator Hunt, how are you, sir?

15        A.     Fine.

16        Q.     Investigator Hunt, tell the Court a little

17    bit about yourself, what you do, where you work?

18        A.     My name is John Hunt, CID investigator,

19    integrity investigator with central office.  I've been an

20    integrity investigator with the Department of Corrections

21    just over 10 years.

22        Q.     And do you have prior law enforcement

23    experience?

24        A.     Yes, sir, three years with Flowood Police

25    Department.

1    Q.    And during your employment you came across my

2    client's name, James Bobo?

3    A.    Yes, sir.

4    Q.    And did you assist Investigator Terrell with

5    that investigation?

6    A.    I did.

7    Q.    Can you tell the Court about some of your

8    findings?

9    A.    Well, as stated, due to conflicting

10   statements we were told to go back and conduct a further

11   investigation without interviewing Chief Rogers or

12   Superintendent Lee.

13   Q.    And so the conflicting statements weren't

14   necessarily anything that Chief Rogers and Superintendent

15   Lee stated before, that the conflict was kind of below,

16   if you will?

17   A.    Yes, sir.

18   Q.    And as an integrity investigator I believe

19   earlier it was testified to that y'all operated kind of

20   as internal affairs for CID?

21   A.    Yes, sir.

22   Q.    And for the entire department as well?

23   A.    Correct.

24   Q.    When you're called, right?

25   A.    Yes, sir.

1    Q.    Okay.  Do you have anything else to add to

2  what Investigator Terrell testified to?

3    A.    No, sir, I don't believe.

4    Q.    Did you assist in preparing the report?

5    A.    No, sir.

6    Q.    But you did participate in the investigation?

7    A.    Yes, sir.

8    Q.    Assisted in making findings of fact?

9    A.    Yes, sir.

10   Q.    And provided those findings to Investigator

11  Terrell?

12   A.    Yes, sir.

13        BY MR. JERSCHEID:  I have no other

14     questions, your Honor.

15        BY THE COURT:  Any cross of this witness?

16        BY MR. AUSTIN:  Yes, sir, just a couple.

17  **CROSS-EXAMINATION BY MR. AUSTIN:**

18   Q.    You stated that you were instructed not to

19  reinterview Lee or Rogers?

20   A.    Yes, sir.

21   Q.    You interviewed other people because of

22  conflicts?

23   A.    Yes, sir.

24   Q.    Wasn't it obvious that Lee had conflicts

25  with some of those other people?

John Hunt - Cross

 1    A.    I mean, quite possibly.  We were going off

 2   our instruction, and some of the officers that were

 3   interviewed by us at central office, members of the K9

 4   team, initially saying they witnessed Investigator Bobo

 5   grab Superintendent Lee.

 6         After going into the investigation none could

 7   actually say they actually saw him, they just assumed

 8   that he grabbed Superintendent Lee.

 9              BY MR. AUSTIN:  Okay.  I have nothing

10      further, your Honor.

11              BY THE COURT:  Any redirect?

12              BY MR. JERSCHEID:  Court's indulgence.  No,

13      your Honor.

14              BY THE COURT:  May the witness be excused?

15              BY MR. JERSCHEID:  Yes, your Honor.

16              BY THE COURT:  You're free to go about your

17      business.

18                  (WITNESS STEPS DOWN.)

19              BY THE COURT:  You may call your next

20      witness.

21              BY MR. JERSCHEID:  I believe we're done,

22      your Honor.

23              BY THE COURT:  You rest?

24              BY MR. JERSCHEID:  Yes, your Honor.

25              BY THE COURT:  Does the State offer any

1    rebuttal?

2            BY MR. AUSTIN:  No, sir.

3            BY THE COURT:  Anyone want to make a

4    statement?

5            BY MR. AUSTIN:  No, sir.

6            BY MR. JERSCHEID:  No, sir.

7            BY THE COURT:  All right.  I'll take the

8    matter under advisement.  I'll get y'all a ruling

9    as soon as I can.  Does anyone have anything

10   further?

11           BY MR. AUSTIN:  No, sir.

12           BY THE COURT:  If nothing further court is

13   adjourned.

14                  (CONCLUDED 12:01 P.M.)

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S PAGE

I, Trudie Quinn, in and for the State of Mississippi, the officer, before whom this sworn testimony was taken, do hereby state on the record:

That due to interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talk-overs; that same is the proper method for a court reporter's transcription of proceeding; that the dashes (--) do not indicate that words or phrases have been left out of this transcript, and that any words and/or names which could not be verified through reference material have been denoted with the phrase (phonetic).

* * *

1          COURT REPORTER'S CERTIFICATE

2          I, Trudie Quinn, Official Court Reporter for

3    the Fourth Circuit Court District of the State of

4    Mississippi, do hereby certify that to the best of my

5    skill and ability I have reported the proceedings had and

6    done in the matter of James Bobo, on the docket of the

7    Circuit Court of the Fourth Judicial District of

8    Washington County, Mississippi, and that the above and

9    foregoing 68 pages contain a true, full and correct

10   transcript of my stenographic notes and tape taken in

11   said proceedings.

12          I do further certify that my certificate

13   annexed hereto applies only to the original and certified

14   transcript and electronic disks.  The undersigned assumes

15   no responsibility for the accuracy of any reproduced

16   copies not made under my control or direction.

17          This the 8th day of May 2017.



18          _____

19               TRUDIE QUINN
                 Official Court Reporter
20               CCR Number 1368

21

22

23

24

25